**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**NEW ALBANY DIVISION**

| | |
|---|---|
| STILLGOOD PRODUCTS, LLC, individually and on behalf of all other similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WESBANCO BANK, INC.,<br><br>Defendant. | Case No. 4:21-cv-00018<br><br>Jury Trial Demanded |

## CLASS ACTION COMPLAINT

Plaintiff, StillGood Products, LLC, individually and on behalf of the class preliminarily defined below (the "Class"), makes the following allegations based upon information and belief, except as to allegations specifically pertaining to Plaintiff, which are based on personal knowledge.

### NATURE OF THE ACTION

1.     Plaintiff brings this action individually and on behalf of a Class of all similarly situated against Defendant, WesBanco Bank, Inc. ("WesBanco"), arising from its routine practice of assessing Overdraft Fees ("OD Fees") on transactions that did not actually overdraw checking accounts.

2.     WesBanco misleadingly and deceptively misrepresents its OD Fee practices, including in its own account contracts.

3.     This is a civil action seeking monetary damages, restitution, and declaratory and injunctive relief.

4.    As described herein, WesBanco's practices violate Indiana statutory and common law, as well as the WesBanco's own form contracts.

## PARTIES

5.    Plaintiff StillGood Products, LLC is a citizen of Indiana and maintains its principal place of business in Jeffersonville, Indiana. Plaintiff had a checking account with WesBanco at all times material hereto.

6.    Defendant WesBanco Bank, Inc., is a citizen of West Virginia and maintains its principal place of business in Wheeling, Ohio County, West Virginia. It has over $4.7 billion in assets and maintains several branches throughout Indiana, Pennsylvania, Ohio, Maryland, Kentucky, and West Virginia.

## JURISDICTION AND VENUE

7.    This Court has original jurisdiction over this putative class action lawsuit pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) & (6), because the aggregate sum of the claims of the members of the putative Class exceeds $5 million, exclusive of interest and costs, because Plaintiff brings this action on behalf of a proposed Class that is comprised of over one hundred members, and because at least one of the members of the proposed Class is a citizen of a different state than WesBanco.

8.    This Court has personal jurisdiction over WesBanco because WesBanco conducted business in and throughout the Southern District of Indiana at all times material hereto.

9.    WesBanco regularly and systematically conducts business and provides retail banking services in this state and provides retail banking services to customers in this state,

including Plaintiff and members of the putative Class. As such, it is subject to the jurisdiction of this Court.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Plaintiff resides in this District, the transactions at issue occurred in this District, and a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in this District. Venue is further proper pursuant to 28 U.S.C. § 1391(b)(3) because Defendant is subject to personal jurisdiction in this District.

## BACKGROUND FACTS

## I.    WesBanco Charges OD Fees on Transactions that Do Not Actually Overdraw the Account

### A.  Overview of Claim

11.     Plaintiff brings this action challenging WesBanco's practice of charging OD Fees on what are referred to in this complaint as "Authorize Positive, Settle Negative Transactions," or "APSN Transactions."

12.     Here's how it works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, WesBanco immediately reduces the consumer's checking account for the amount of the purchase, sets aside funds in the checking account to cover that transaction, and adjusts the consumer's displayed "available balance" to reflect that subtracted amount. As a result, customers' accounts will always have sufficient funds available to cover these transactions because WesBanco has already sequestered these funds for payment.

13.     However, WesBanco still assesses crippling $35 OD Fees on many of these transactions and mispresents its practices in its account documents.

14.     Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, WesBanco later assesses OD Fees on those same transactions when they purportedly settle days later into a negative balance. These types of transactions are APSN Transactions.

15.     WesBanco maintains a running account balance, tracking funds consumers have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, WesBanco sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the account holder and such funds are specifically associated with a given debit card transaction.

16.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498 (Jan. 29, 2009).

17.     That means when any subsequent, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for any earlier debit card transactions. Therefore, many subsequent transactions incur OD Fees due to the unavailability of the funds sequestered for those debit card transactions.

18.    Still, despite always reserving sufficient available funds to cover the transactions and keeping the held funds off-limits for other transactions, WesBanco improperly charges OD Fees on APSN Transactions.

19.    The Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> [A] financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.

> At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, "Supervisory Highlights" (Winter 2015).

20.    There is no justification for these practices, other than to maximize WesBanco's OD Fee revenue. APSN Transactions only exist because intervening checking account transactions supposedly reduce an account balance. But WesBanco is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year. But WesBanco was not content with these millions in OD Fees. Instead, it sought millions more in OD Fees on APSN Transactions.

21.    Besides being deceptive, unfair, and unconscionable, these practices breach promises made in WesBanco's adhesion contracts, which fundamentally misconstrue and mislead consumers about the true nature of WesBanco's processes and practices. WesBanco also exploits its contractual discretion by implementing these practices to gouge its customers.

22.    In plain, clear, and simple language, the checking account contract documents covering OD Fees promise that WesBanco will only charge OD Fees on transactions that have insufficient funds to cover those transactions.

23.    WesBanco is not authorized by contract to charge OD Fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

**B.  Mechanics of a Debit Card Transaction**

24.    A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from WesBanco. When a merchant or customer physically or virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to WesBanco, which verifies that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

25.     At this step, if the transaction is approved, WesBanco immediately decrements the funds in a consumer's account and sequesters funds in the amount of the transaction but does not yet transfer the funds to the merchant.

26.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

27.     WesBanco (like all banks and credit unions) decides whether to "pay" debit card transactions at authorization. After that, WesBanco is obligated to pay the transaction no matter what. For debit card transactions, that moment of decision can only occur at the point of sale, when the transaction is authorized or declined. It is at that point—and only that point—that WesBanco may choose to either pay the transaction or to decline it. When the time comes to actually transfer funds for the transaction to the merchant, it is too late for the bank to deny payment—the bank has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

28.     There is no change—no impact whatsoever—to the available funds in an account when this transfer occurs.

**C.  WesBanco's Account Contract**

29.     Plaintiff had a WesBanco checking account, which is governed by WesBanco's "Terms and Conditions of Your Account" document ("Deposit Agreement"), attached hereto as Exhibit A.

30.     The Deposit Agreement states WesBanco may charge an OD Fee when it "honor[s] withdrawal requests that overdraw your account." *Id*. at 3.

7

31.    In breach of this basic promise, WesBanco assesses OD Fees on debit card transactions that do not overdraw the account.

32.    The Deposit Agreement further states that WesBanco's determines whether a debit card transaction causes an overdraft when WesBanco decides to pay or return an item:

> We may determine the amount of available funds in your account for the purpose of deciding whether to return an item for insufficient funds at any time between the time we receive the item and when we return the item or send a notice in lieu of return.

*Id*.

33.    WesBanco also promises to consider the amount of "available and collected funds" in the account in order to determine whether an overdraft occurs and whether to authorize a debit card transaction:

> We will not authorize the transaction if the amount of available and collected funds in your designated checking account is less than the amount of the transaction . . . .

*Id*. at 20.

34.    Because WesBanco may determine whether to "honor," pay, or return the item only at the time of authorization, the above promises mean that overdrafts must be determined when WesBanco authorizes a debit card transaction.

35.    The Deposit Agreement further states WesBanco will place "holds" on funds for debit card transactions at the time they were authorized and that such holds immediately reduce the undefined account's balance:

> Once you use your card in connection with a non-Visa debit card transaction, in most cases, **the funds are immediately debited from your account balance**. . . . Once you have used your card in conjunction with a Visa debit card transaction, **we have the right to place a hold on the funds in your designated checking account until that transaction is posted against your account.**

*Id.* (emphasis added).

36.     Because WesBanco promises to place holds at the time of authorization and that those holds remain until the transaction settles, there are always sufficient funds in the account to cover APSN Transactions—yet WesBanco assesses OD Fees on them anyway.

37.     The above promises indicate that transactions are only overdraft transactions when they are authorized and approved into a negative account balance. Of course, that is not true for APSN Transactions.

38.     In fact, WesBanco actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to post those same transactions. Instead, it uses a secret posting process described below.

39.     The above representations and contractual promises are untrue. WesBanco actually charges OD Fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. No express language in any document authorizes WesBanco to impose OD Fees on any APSN Transactions.

40.     The account documents also misconstrue WesBanco's true debit card processing and overdraft practices.

41.     First, and most fundamentally, WesBanco charges OD Fees on debit card transactions for which there are sufficient funds available to cover the transactions.

42.     WesBanco's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates its contractual promise not to do so.

43.     Next, because sufficient funds for APSN Transactions are actually debited from the account at authorization, which is consistent with standard industry practice, the funds cannot be re-debited later. But that is what WesBanco does when it re-debits the account during a secret posting process.

44.     In reality, WesBanco's actual practice is to assay the same debit card transaction twice to determine if the transaction overdraws an account—both at the time of authorization and later at the time of settlement.

45.     At the time of settlement, however, an available balance *does not change at all* for transactions previously authorized into positive funds and for which sufficient funds were held. As such, WesBanco cannot then charge an OD Fee on these transactions because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

46.     Upon information and belief, something more is going on: at the moment a debit card transaction is about to settle, WesBanco switches from using the "available" balance to determine whether the transaction overdrew the account to using the account's "actual" or "ledger" balance to determine whether the transaction overdrew the account.

47.     Because the "available balance" is reduced at authorization to reflect the hold placed for authorized debit card transactions, a debit card transaction that is authorized on sufficient funds and for which sufficient funds were held can never overdraw the account's available balance when that same transaction posts or settles. By switching to using the account's actual or ledger balance, which does not reflect these authorization holds, WesBanco essentially releases and disregards the authorization hold placed on funds for the transaction, then re-debits the same transaction a second time.

48.     This secret step allows WesBanco to charge OD Fees on transactions that never should have gotten them—transactions that were authorized into sufficient funds, and for which WesBanco specifically set aside money to settle.

49.     There is no language in the Deposit Agreement authorizing WesBanco to use different account balances at authorization and settlement. In fact, the parties never agreed that WesBanco could determine overdrafts based on the account's actual or ledger balance at all.

50.     To the contrary, the Deposit Agreement promises that overdrafts will be determined only at the time of authorization, and only if the account has "insufficient funds." Ex. A at 3.

51.     Nevertheless, WesBanco uses multiple unspecified and undefined account balances to determine whether a debit card transaction overdraws the account at multiple points in that transaction's lifecycle.

52.     The Deposit Agreement never authorizes such practices, and Plaintiff and other consumers certainly never agreed to such practices.

53.     This discrepancy between WesBanco's actual practices and its contract's representations cause consumers to incur improper and unlawful OD Fees.

54.     In sum, there is a huge gap between WesBanco's practices as described in the account documents and WesBanco's actual practices.

55.     Other financial institutions like WesBanco that employ this abusive practice disclose it expressly to their account holders and require them to agree to it—something WesBanco here never did.

56.     Indeed, recognizing the complexity of the settlement process for APSN Transactions and the fact that a fee in such circumstances is counterintuitive to accountholders, financial institutions generally provide express warnings that APSN Transactions can incur OD Fees as well as explanations and examples of how such fees occur.

57.     For example, Bank of America's deposit agreement states:

11

Debit card transactions and related authorization holds may impact your available balance. It is important to know that your available funds may change between the time you authorize a transaction and when the transaction is paid. . . . **The amount being held is not applied to the debit card transaction**. . . . **If other account activity has caused the funds available in your account to drop below zero before the debit card transaction is paid, you may no longer have sufficient funds to pay the merchant**. . . .

Here is an example of how that may happen: On Monday we authorize a debit card transaction because you have enough available funds at the time. A hold is then placed on your funds until the merchant presents the transaction for payment. On Tuesday we process and post another transaction (such as a check you wrote) that reduces your available funds below zero. If the merchant presents the original debit card transaction for payment on Wednesday, and your available funds are now below the amount needed to pay the transactions, the debit card transaction will overdraw your account and you may incur an overdraft fee.

*Deposit Agreement and Disclosure*, Bank of America 19 (Nov. 6, 2020), https://bit.ly/3g6IyEW

(emphasis added).

58.    As another example, Canvas Credit Union states:

Available balance **at the time transactions are posted (not when they are authorized)** may be used to determine when your account is overdrawn. The following example illustrates how this works:

Assume your actual and available balance are both $100, and you swipe your debit card at a restaurant for $60. As a result, your available balance will be reduced by $60 so your available balance is only $40. Your actual balance is still $100. Before the restaurant charge is sent to us for posting, a check that you wrote for $50 clears. Because you have only $40 available. . . . your account will be overdrawn by $10, even though your actual balance was $100 before the check posted. . . Also, when the $60 restaurant charge is presented to the Canvas and posted to your account, you will not have enough money in your available balance because of the intervening check, and you will be charged a fee for that transaction as well, even though your available balance was positive when it was authorized.

*Member Service Agreement, Part 2*, Canvas Credit Union 30 (Nov. 5, 2019),

https://bit.ly/2FoxAOv (emphases in original).

59.    Capital One's deposit agreement similarly states:

Other intervening transactions that occur while authorized debit card transactions are pending may create overdrafts on your account. Here is an example of how that could happen:

You're enrolled in our optional overdraft service. Your account balance is $100.00. On Monday, you go to the store and use your debit card to make a purchase for $80.00. We authorize the transaction; however, the merchant doesn't send us the transaction for payment and posting to your account on that day. On Tuesday, you withdraw $30.00 from an ATM, reducing your account balance to $70. **On Wednesday, the merchant requests payment for the $80.00 transaction authorized on Monday, and you're charged a fee because the balance in your account is insufficient to pay the transaction at that time**.

*Rules Governing Deposit Accounts*, Capital One (June 24, 2020), https://capital.one/312vrjW

(emphasis added).

60.　　WesBanco makes no such agreement with its customers, and actually promises that OD Fees will *not* be assessed if there are sufficient funds in the account at authorization. In so doing, WesBanco deceives its account holders.

### D.  WesBanco Abuses Contractual Discretion

61.　　WesBanco's practice of charging OD Fees on APSN Transactions is not simply a breach of the express terms of the numerous account documents; WesBanco's OD Fee practices also exploit contractual discretion to the detriment of account holders.

62.　　The terms "honor," "pay," "insufficient funds," "account balance," and "available and collected balance" are not defined in the account documents. WesBanco uses its discretion to define these terms in a manner contrary to any reasonable, common sense understanding of that term. In WesBanco's implied definition, a balance is insufficient to "pay" a transaction even if WesBanco sequesters sufficient available funds for that transaction at the time it is made and holds those funds in the account until the transaction settles.

63.    Moreover, WesBanco uses its contractual discretion to cause APSN Transactions to incur OD Fees by knowingly allowing later made transactions to consume available funds previously sequestered for APSN Transactions.

64.    WesBanco uses all of these contractual discretion points unfairly to extract OD Fees on transactions that no reasonable consumer would believe could cause OD Fees.

### E.  Reasonable Consumers Understand Debit Card Transactions Are Debited Immediately

65.    The assessment of OD Fees on APSN Transactions is fundamentally inconsistent with the immediate withdrawal of funds for debit card transactions. That is because if funds are immediately debited, they cannot be depleted by intervening transactions. If funds are immediately debited, they are necessarily applied to the debit card transactions for which they are debited.

66.    WesBanco was and is aware that this is precisely how account holders reasonably understand debit card transactions to work.

67.    WesBanco knows that many consumers prefer debit cards for these very reasons. Consumer research indicates that consumers prefer debit cards as a budgeting device because they do not allow debt like credit cards do and because the money comes directly out of a checking account.

68.    Consumer Action, a national nonprofit consumer education and advocacy organization advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need to Know About Using a Debit Card?*, ConsumerAction (Jan. 14, 2019), https://bit.ly/2FxOHxA.

69.     Further, Consumer Action informs consumers that "Debit cards offer the convenience of paying with plastic without the risk of overspending. When you use a debit card, you do not get a monthly bill. You also avoid the finance charges and debt that can come with a credit card if not paid off in full." *Understanding Debit Cards*, ConsumerAction, https://bit.ly/323djFM (last visited Jan. 16, 2021).

70.     This understanding is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have viewed debit cards (along with credit cards) "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases*, MarketWatch (Mar. 23, 2016), https://on.mktw.net/312vnRa.

71.     Not only have consumers increasingly substituted debit cards for cash, but they believe that a debit card purchase is the fundamental equivalent of a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

72.     WesBanco was aware of the consumer perception that debit transactions reduce an available balance at a specified time and in a specified order—namely, at the moment that they are actually authorized—and WesBanco's Deposit Agreement only supports this perception.

73.     Moreover, this abusive practice is not universal in the financial services industry. Indeed, major banks like Wells Fargo—one of the largest consumer banks in the country—do not undertake the practice of charging OD Fees on debit card transactions that were previously authorized on sufficient funds.

### F.  Plaintiff's Debit Card Transactions

74.    On March 9, 2015, Plaintiff's account was assessed $35 OD Fees on four transactions that settled that day. However, the transactions that purportedly caused the fees were previously authorized into a positive account balance.

75.    Because WesBanco had previously sequestered sufficient funds to cover those transactions, Plaintiff's account always had sufficient funds to cover the transactions and should not have been assessed fees.

76.    On March 30, 2015, Plaintiff's account was assessed $35 OD Fees on five transactions that settled that day. However, the transactions that purportedly caused the fees were previously authorized into a positive account balance.

77.    Because WesBanco had previously sequestered sufficient funds to cover those transactions, Plaintiff's account always had sufficient funds to cover the transactions and should not have been assessed fees.

78.    On June 8, 2015, Plaintiff's account was assessed a $35 OD Fee on a transaction that settled that day. However, the transaction that purportedly caused the fee was previously authorized into a positive account balance.

79.    Because WesBanco had previously sequestered sufficient funds to cover that transaction, Plaintiff's account always had sufficient funds to cover the transactions and should not have been assessed a fee.

80.    Plaintiff was further charged $35 OD Fees on the following dates, even though the transactions that purportedly caused the fees were previously authorized into a positive account balance: August 17, 2015, September 9, 2015, October 6, 2015, October 27, 2015, February 5, 2016, April 18, 2016, May 9, 2016, September 16, 2016, May 10, 2017, August 25, 2017, September 25, 2017, November 17, 2017, November 24, 2017, January 23, 2018, May 2,

16

2018, May 9, 2018, July 3, 2018, July 13, 2018, July 19, 2018, August 8, 2018, September 5, 2018, December 11, 2018, January 9, 2019, May 10, 2019, July 20, 2019, and September 4, 2019.

81.     On October 18, 2019, WesBanco "charged off" Plaintiff's account, which at that point had a negative balance of - $1,135.84. A significant portion of this shortfall was due to the OD Fees, many of which were improper, that WesBanco had charged Plaintiff the previous month.

82.     Around this time, WesBanco also reported Plaintiff to ChexSystems, a consumer reporting agency.

83.     The improper fees charged by WesBanco were not "errors" by WesBanco, such as an "unauthorized signature" "alteration," or "forgery" but rather were intentional charges made by WesBanco as part of its standard processing of transactions.

84.     Plaintiff therefore had no duty to report the fees as "errors" because they were not "errors," but were systematic and intentional assessment of fees according to WesBanco's standard practices.

85.     Moreover, any such reporting would have been futile as WesBanco had made a decision to charge the fees in this specific manner to maximize profits at the expense of customers.

86.     WesBanco and its affiliates are still pursuing this debt from Plaintiff.

## CLASS ACTION ALLEGATIONS

87.     *Description of the Class*: Plaintiff brings this action individually and on behalf of the following class of persons:

17

> All accountholders who, during the applicable statute of limitations, were charged OD Fees on transactions that did not overdraw a WesBanco checking account.

88.     Excluded from the Class are WesBanco's officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns. Also excluded from the Class are any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

89.     The time period for the Class is the number of years immediately preceding the date on which this Complaint was filed as allowed by the applicable statute of limitations, going forward into the future until such time as WesBanco remedies the conduct complained of herein.

90.     *Numerosity*: The members of the proposed Class are so numerous that individual joinder of all members is impracticable. The exact number and identities of the members of the proposed Class are unknown at this time and can be ascertained only through appropriate discovery. Plaintiff estimates the number of members in each Class to be in the thousands.

91.     *Commonality and Predominance*: There are many questions of law and fact common to Plaintiff and the Class, and those questions substantially predominate over any questions that may affect individual Class members. Common questions of law and fact include:

   a.   Whether WesBanco charged OD Fees on transactions that did not overdraw an account;

   b.   Whether WesBanco breached its own contract by charging OD Fees on transactions that did not overdraw an account;

   c.   Whether WesBanco breached the covenant of good faith and fair dealing;

   d.   Whether WesBanco's OD Fee practices violate the Indiana Deceptive Consumer Sales Act;

     e.   The proper method or methods by which to measure damages; and

     f.   The declaratory and injunctive relief to which the Class is entitled.

92.    *Typicality:* Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class have been similarly affected by WesBanco's actions.

93.    *Adequacy of Representation*: Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex and consumer class action litigation. Plaintiff and Plaintiff's counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so.

94.    *Superiority of Class Action*: Plaintiff and the members of the Class suffered, and will continue to suffer, harm as a result of WesBanco's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the present controversy. Individual joinder of all members of the Class is impractical. Even if individual Class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by WesBanco's common course of conduct. The class action device allows for unitary adjudication, judicial economy, and the fair and equitable handling of all class members' claims in a single forum. The conduct of this action as a class action conserves the resources of the parties and of the judicial system and protects the rights of the Class members.

95.    *Risk of Inconsistent or Varying Adjudication*: Class action treatment is proper, and this action should be maintained as a class action because the risks of separate actions by individual members of the Class would create a risk of: (a) inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of

conduct for WesBanco as the party opposing the Class; and/or (b) adjudications with respect to individual Class members would, as a practical matter, be dispositive of the interests of other Class members not party to the adjudication or would substantially impair or impede their ability to protect their interests.

96.    *Action Generally Applicable to Class as a Whole*: WesBanco, as the party opposing the Class, has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

**FIRST CLAIM FOR RELIEF**
**Breach of Contract, Including Breach of the Covenant of Good Faith and Fair Dealing**
**(On Behalf of Plaintiff and the Class)**

97.    Plaintiff incorporates by reference the preceding paragraphs.

98.    Plaintiff and WesBanco have contracted for banking services, as embodied in WesBanco's account documents.

99.    All contracts entered by Plaintiff and the Class are identical or substantively identical because WesBanco's form contracts were used uniformly.

100.    WesBanco has breached the express terms of its own agreements as described herein.

101.    Under Indiana law, good faith is an element of every contract between banks and their customers because banks are inherently in a superior position to their checking account holders and, from this superior vantage point, they offer customers contracts of adhesion, often with terms not readily discernible to a layperson.

102.    Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—

not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

103.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain and abuse of a power to specify terms.

104.    WesBanco abused the discretion it granted to itself when it charged OD Fees on transactions that did not overdraw an account.

105.    In these and other ways, WesBanco violated its duty of good faith and fair dealing.

106.    WesBanco willfully engaged in the foregoing conduct for the purpose of (1) gaining unwarranted contractual and legal advantages; and (2) unfairly and unconscionably maximizing fee revenue from Plaintiff and other members of the Class.

107.    Plaintiff and members of the Class have performed all, or substantially all, of the obligations imposed on them under the agreements.

108.    Plaintiff and members of the Class have sustained damages as a result of WesBanco's breaches of the parties' contracts and breaches of contract through violations of the covenant of good faith and fair dealing.

## SECOND CLAIM FOR RELIEF
### Violation of the Indiana Deceptive Consumer Sales Act
### (On Behalf of Plaintiff and the Class)

109.    Plaintiff incorporates by reference the preceding paragraphs.

110.    The purposes and policies of the Indiana Deceptive Consumer Sales Act ("DCSA"), Indiana Code § 24-5-0.5-1 to -12, are to:

(1) simplify, clarify, and modernize the law governing deceptive and unconscionable consumer sales practices;

(2) protect consumers from suppliers who commit deceptive and unconscionable consumer sales practices; and

(3) encourage the development of fair consumer sales practice.

Ind. Code § 24-5-0.5-1(b).

111.    The General Assembly has instructed courts to construe the DCSA liberally to promote these purposes and policies. Ind. Code § 24-5-0.5-1(a).

112.    WesBanco is a "supplier" as defined in the DCSA because it is a seller or other person who regularly engages in or solicits consumer transactions, which are defined to include sales of personal property, services, and intangibles that are primarily for a personal, familial, or household purpose, such as those at issue in this action. Ind. Code § 24-5-0.5-2(1), (3).

113.    The DCSA provides that "[a] supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction. Such an act, omission, or practice by a supplier is a violation of [the DCSA] whether it occurs before, during, or after the transaction. An act, omission, or practice prohibited by this section includes both implicit and explicit misrepresentations." Ind. Code § 24-5-0.5-3(a).

114.    The DCSA further provides:

Without limiting the scope of subsection (a) the following acts, and the following representations as to the subject matter of a consumer transaction, made orally, in writing, or by electronic communication, by a supplier, are deceptive acts:

(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have.

22

(2) That such subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not. . . .

Ind. Code § 24-5-0.5-3.

115.   WesBanco committed deceptive acts, including but not limited to:

a.   Representing that its account deposit, checking, ATM, and debit card services had performance, characteristics, uses, or benefits they did not have and which WesBanco knew or should reasonably have known they do not have; and

b.   Representing that its account deposit, checking, ATM, and debit card services were of a particular standard, quality, grade, style, or model, when they were not and when WesBanco knew or should reasonably have known that they were not.

116.   WesBanco's violations were willful and were done as part of a scheme, artifice, or device with intent to defraud or mislead, and therefore are incurable deceptive acts under the DCSA.

117.   The DCSA provides that "[a] person relying upon an uncured or incurable deceptive act may bring an action for the damages actually suffered as a consumer as a result of the deceptive act or five hundred dollars ($500), whichever is greater. The court may increase damages for a willful deceptive act in an amount that does not exceed the greater of: (i) three (3) times the actual damages of the consumer suffering the loss; or (ii) one thousand dollars ($1,000). Ind. Code § 24-5-0.5-4(a).

118.   The DCSA provides that "[a]ny person who is entitled to bring an action under subsection (a) on the person's own behalf against a supplier for damages for a deceptive act may bring a class action against such supplier on behalf of any class of persons of which that person is a member . . . ." Ind. Code § 24-5-0.5-4(b).

119.   Had Plaintiff and members of the Class been aware that they were going to be charged OD Fees in the manner WesBanco assessed them, Plaintiff and members of the Class would not have entered into such transactions and would not have incurred the additional fees.

120.    As a direct and proximate result of Defendant's unfair and deceptive acts and practices in violation of the DCSA, Plaintiff and members of the Class have incurred more OD Fees than they should have and have suffered monetary damages for which Defendant is liable.

121.    Plaintiff and members of the Class seek actual damages plus interest on damages at the legal rate, as well as all other just and proper relief afforded by the DCSA. As redress for WesBanco's repeated and ongoing violations, Plaintiff and members of the Class are entitled to, *inter alia*, actual damages, treble damages, attorneys' fees, and injunctive relief.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court:

a. Certify this case as a class action, designating Plaintiff as the Class Representative and designating the undersigned as Class Counsel;

b. Award Plaintiff and the Class actual damages in an amount to be proven at trial;

c. Award Plaintiff and the Class restitution in an amount to be proven at trial;

d. Award Plaintiff and the Class statutory damages under the DCSA;

e. Award Plaintiff and the Class pre-judgment interest in the amount permitted by law;

f. Award Plaintiff and the Class attorneys' fees and costs as permitted by law;

g. Grant Plaintiff and the Class a trial by jury;

h. Grant leave to amend these pleadings to conform to evidence produced at trial; and

i. Grant such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff, by counsel, demands trial by jury.

Respectfully submitted,

/s/ *Lynn A. Toops*
Lynn A. Toops
Lisa M. La Fornara
Tyler B. Ewigleben
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
T: (317) 636-6481
ltoops@cohenandmalad.com
llafornara@cohenandmalad.com
tewigleben@cohenandmalad.com

J. Gerard Stranch, IV*
Martin F. Schubert*
BRANSTETTER, STRANCH
& JENNINGS, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
T: (615) 254-8801
F: (615) 255-5419
gerards@bsjfirm.com
martys@bsjfirm.com

Christopher D. Jennings*
JOHNSON FIRM
610 President Clinton Avenue, Suite 300
Little Rock, Arkansas 72201
Phone: (501) 372-1300
Fax: (888) 505-0909
chris@yourattorney.com

* To seek admission *pro hac vice*

**Counsel for Plaintiff and the Proposed Plaintiff Class**